FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ SEP 30 201▓

BROOKLYN OFFICE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

KELVIN CASTILLO                 :

                 Petitioner,    :

      -against-              :

UNITED STATES OF AMERICA,    :

                 Respondent.    :

------------------------------------------------------------------x

**MEMORANDUM & ORDER**

09-CV-4222 (ENV)

**VITALIANO, D.J.**

      Kelvin Castillo is before the Court on his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2255, challenging his conviction and sentence for aggravated identity theft. Judgment was entered on Castillo's plea of guilty. The relevant statutes, 18 U.S.C. §§ 1028(a)(1) and 1028A(b), mandate imposition of a two-year consecutive term of imprisonment upon conviction of certain enumerated felonies if, "during and in relation to" the felony, the perpetrator "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person." Following a hearing and upon the findings stated below, the writ is denied.

## I.    BACKGROUND

      Castillo, a citizen of the Dominican Republic, legally entered the United States in 1984. Following several convictions for narcotics possession, probation violations, and a conviction for assault, he was deported in early 2006. About five months after his deportation, he arrived at John F. Kennedy Airport and presented a United States passport with his photo bearing the name "Jorge Luis Nieves." Castillo was also in possession of a birth certificate and social security

1



card in the name of Jorge Luis Nieves. Federal agents determined that the passport had been falsified and detained Castillo. In July 2006, petitioner was indicted on three charges: (1) illegal re-entry of an alien deported following criminal conviction in violation of 8 U.S.C. §§ 1326(a) and 1326(b)(2); (2) passport fraud in violation of 18 U.S.C. § 1543; and (3) aggravated identity theft in violation of 18 U.S.C. §§ 1028A(a)(1) and 1028A(b).

On November 3, 2006, Castillo entered into a plea agreement with the government. He pled guilty to the illegal re-entry and aggravated identity theft counts. At sentencing, the government moved to dismiss the passport fraud count. The plea agreement contained an appellate waiver that barred Castillo from appealing both his conviction and sentence. During the plea allocution, Castillo admitted he illegally entered the United States after being deported, and that he possessed a passport bearing the name Jorge Nieves, but which contained Castillo's own photograph. On May 25, 2007, the Court sentenced petitioner to 52 months imprisonment for illegal re-entry and 24 months imprisonment for aggravated identity theft, to be served consecutively as required by statute.

On May 31, 2007, petitioner filed a notice of appeal. He argued that: (1) the appellate waiver was unenforceable as it was not entered into knowingly and voluntarily, (2) his sentence was unreasonable, and (3) the Court had erred by failing to articulate its reasons for departing upwardly in his sentence. On December 29, 2008, the Second Circuit affirmed Castillo's conviction and sentence but remanded the case to allow the Court to make "ministerial corrections" to the judgment. United States v. Castillo, No. 07-3641-cr, Slip Op. (2d Cir. Dec. 29, 2008). On March 12, 2009, the Court entered an amended judgment. Petitioner took no other action on direct appeal.

2

On May 4, 2009, about 30 months after Castillo's plea, the Supreme Court decided United States v. Flores-Figueroa, 129 S. Ct. 1886 (2009). The Court held that in an aggravated identity theft prosecution, the government must prove "that the defendant knew that the means of identification at issue belonged to another person." Id. at 1894. Castillo filed this § 2255 petition on August 31, 2009, claiming ineffective assistance of trial and appellate counsel and actual innocence of aggravated identity theft. On November 24, 2009, he filed what he referred to as a "Motion to Attenuate" his petition, abandoning all claims except that of actual innocence regarding the aggravated identity theft conviction.

## II.    DISCUSSION

### A.  Standard of Review under 28 U.S.C. § 2255

A person who has been convicted and is currently a federal prisoner may petition the sentencing court to correct, vacate, or set aside the sentence under 28 U.S.C. § 2255. The grounds for relief are very limited. The § 2255 court may only grant relief if it concludes: "(1) 'that the sentence was imposed in violation of the Constitution or laws of the United States;' (2) 'that the court was without jurisdiction to impose such sentence;' (3) 'that the sentence was in excess of the 'maximum authorized by law;' or (4) that the sentence 'is otherwise subject to collateral attack.'" Hill v. United States, 368 U.S. 424, 426-27, 82 S. Ct. 468, 470 (1962).

### B.  Plea Waiver

The government contends that Castillo's petition is procedurally barred because he waived his right to appeal in his plea agreement. But even if a claim is procedurally barred, the bar may be overcome where the petitioner establishes either: (1) cause and actual prejudice from the alleged violations, or (2) actual innocence. Zhang v. United States, 506 F.3d 162, 166 (2d

3

Cir. 2007) (citing Bousley v. United States, 523 U.S. 614, 622, 118 S. Ct. 1604, 1611 (1998)).

"The Supreme Court has stated that 'cause' under the cause and prejudice test must be something external to the petitioner, something that cannot be fairly attributed to him." Marone v. United States, 10 F.3d 65, 67 (2d Cir. 1993) (internal quotations omitted). While a "change in substantive law usually does not constitute 'cause' to overcome procedural default," Graham v. United States, No. 09 Civ 5586, 2010 U.S. Dist. LEXIS 68273, at *6 (E.D.N.Y. July 8, 2010), if the procedurally defaulted claim is "so novel that its legal basis was not reasonably available to counsel," this is sufficient to establish "cause." Petronio v. Walsh, 736 F. Supp. 2d 640, 656 (E.D.N.Y. 2010) (citing Bousley, 468 U.S. at 622). Alternatively, to succeed on a claim of "actual innocence," a petitioner must prove that, in light of all admissible evidence, it is more likely than not that no reasonable juror would have convicted him. Fountain v. United States, 357 F.3d 250, 255 (2d Cir. 2004) (internal citations omitted).

Castillo's petition lies in this heartland. He challenges his conviction and sentence on the ground that he is "actually innocent" of the crime for which he is currently incarcerated. And if he can demonstrate actual innocence, the procedural bar is not an impediment to the Court granting relief under § 2255. In point of fact, while the Second Circuit has long recognized that an appellate waiver is enforceable if there is sufficient evidence to establish that the waiver was entered into knowingly and voluntarily, see, e.g., United States v. Hernandez, 242 F.3d 110, 133 (2d Cir. 2001); United States v. Garcia, 166 F.3d 519, 521 (2d Cir. 1999), the Supreme Court has caveated that, in order for a plea agreement to be valid, the defendant must have entered his plea "intelligently," see Bousley, 523 U.S. at 618 (holding that a plea does not qualify as intelligent unless a criminal defendant first receives "real notice of the true nature of the charge against him,

4

the first and most universally recognized requirement of due process") (citations omitted).  Given the guidance of <u>Flores-Figueroa</u>, Castillo did not, and could not, have entered into the plea agreement *intelligently* because neither he nor the government correctly understood the requirements for conviction of aggravated identity theft under 18 U.S.C. § 1028A.  Reflecting that misunderstanding, there is no dispute that Castillo's allocution did not set forth facts sufficient to support conviction on that charge.  In any event, there is no need to parse the meaning of "intelligently", other than for background perspective on the critical question of whether Castillo is actually innocent of the charge as defined by the Supreme Court.  Fundamental principles of fairness require he be heard on that issue given the fundamental mutual misunderstanding of the crime at the time of the plea.

## C. <u>Actual Innocence</u>

The Supreme Court has made it clear that in order for a petitioner to establish actual innocence, he must demonstrate factual innocence, not mere legal insufficiency of proof.  <u>See</u> <u>Bousley</u>, 523 U.S. at 623.  Castillo, as a consequence, must prove that, considering *all* admissible evidence, it is more likely than not that no reasonable juror would have convicted him.  <u>Fountain</u>, 357 F.3d at 255 (citations omitted).  Critically, in the post-conviction proceeding

> the Government is not limited to the existing record to rebut any showing that petitioner might make. Rather . . . the Government [is] permitted to present any admissible evidence of petitioner's guilt even if that evidence was not presented during petitioner's plea colloquy and would not normally have been offered . . .

<u>Bousley</u>, 523 U.S. at 623-624.

### a.  *More Serious Charge*

More than one key is required to unlock the jailhouse door.  The government contends that in order to raise his actual innocence of the aggravated identity theft charge, Castillo, in addition to overcoming the appellate waiver bar, must also prove that he is actually innocent of the passport fraud charge, which was dismissed as part of the plea agreement and which the government contends is a more serious charge.  Indeed, "[i]n cases where the government has forgone more serious charges in the course of plea bargaining, petitioner's showing of actual innocence must also extend to those charges."  Bousley, 523 U.S. at 624.  But the case law regarding how courts should determine the "more serious" charge is far from definite.

The government, with some support, urges the Court to adopt a statutory maximum approach in making the determination.  Notably, neither the Supreme Court nor the Second Circuit has provided guidance on how "more serious" language should be interpreted.  Following the majority of circuits which have decided this issue, the Court declines to adopt the government's suggested approach.  Instead, the Court will determine which of the two relevant counts Castillo faced was the more serious crime by evaluating the sentencing guidelines range that was applicable to Castillo's actual sentencing on Count 3 and the hypothetical range that would have been applicable to his sentencing on Count 2.  See United States v. Halter, 217 F.3d 551, 553 (8th Cir. 2000) ("actual punishment as determined by the Guidelines is the proper basis for identifying the 'more serious charge'"); United States v. Lloyd, 188 F.3d 184, 189 n.13 (3d Cir. 1999) ("[I]t is the actual penalty prospectively assessed this defendant for each Count—determined in accordance with the refining criteria of the United States Sentencing Guidelines and set forth in the government's Presentencing Report—that is relevant to [the] comparison of

the seriousness of the respective charges at the time of the plea bargain."); but see Peveler v. United States, 269 F.3d 693, 701 (6th Cir. 2001) (considering the "mandatory minimum sentence" when determining the more serious charge); Alcock v. Spitzer, 349 F. Supp. 2d 630, 637 (E.D.N.Y. 2004) (in the context of a § 2254 petition, evaluating the seriousness of the offense according to their classifications under the New York Penal law in an essentially indeterminate sentencing system without sentencing guidelines).

More analytically, petitioner's indictment charged illegal re-entry of a deported alien in violation of 8 U.S.C. §§ 1326(a) and 1326(b)(2); passport fraud in violation of 18 U.S.C. § 1543; and aggravated identity theft in violation of 18 U.S.C. §§ 1028A(a)(1) and 1028A(b). The government concedes in its papers that if Castillo had been convicted of illegal re-entry and passport fraud (instead of illegal re-entry and aggravated identity theft) his advisory guidelines range would not have been as high. Though passport fraud carries a higher statutory maximum—10 years for passport fraud as opposed to two years for aggravated identity theft— any sentence on the passport fraud charge would have run, per the guidelines, concurrently with and been subsumed by, the sentence for illegal re-entry. It would not have added a day to Castillo's 52-month sentence for illegal re-entry. On the other extreme, the aggravated identity theft conviction carries a mandatory *consecutive* two-year sentence. No doubt, this is likely the reason the government chose to dismiss the passport fraud count and insist upon Castillo's plea to the aggravated identity theft count in the first place. Since "[i]t is not sensible . . . to apply an abstract statutory maximum punishment when the application of the Guidelines to the same conduct leads to a period of imprisonment [that is] shorter," Halter, 217 F.3d at 553, an argument relying on such happenstance is unpersuasive. Given the applicable guidelines sentencing ranges

for both offenses, the Court finds that the aggravated identity theft charge is the more serious one

Castillo faced.  He, therefore, must only demonstrate actual innocence of aggravated identity

theft, and not of passport fraud as well.

### b.  *Flores-Figueroa and its progeny*

Title 18 U.S.C. § 1028A(a)(1) provides:

> Whoever, during and in relation to any felony violation
> enumerated in subsection (c), knowingly transfers, possesses, or
> uses, without lawful authority, a means of identification of another
> person shall, in addition to the punishment provided for such
> felony, be sentenced to a term of imprisonment of 2 years.

In Flores-Figueroa, the Supreme Court resolved a circuit split on the issue of a defendant's

requisite knowledge when charged with aggravated identity theft.[1]  The Court held that

"§ 1028A(a)(1) requires the Government to show that the defendant knew that the means of

identification at issue belonged to another person." Flores-Figueroa, 129 S. Ct. at 1894.  It found

that "[a]s a matter of ordinary English grammar," the phrase "knowingly" in the statute should be

read "as applying to all the subsequently listed elements of the crime." Id. at 1890.  Notably, the

Court addressed and explicitly rejected the government's enforceability concerns, that is, "the

difficulty . . . proving beyond a reasonable doubt that a defendant has the necessary knowledge."

Id. at 1893.  Using the example of a defendant who plainly uses the identification of another but

does not necessarily care whether the identification belonged to another person or was simply

counterfeit, the Court rejected the argument that "[t]he difficulties of proof along with the

defendant's necessary guilt of a predicate crime and the defendant's necessary knowledge that he

has acted 'without lawful authority,' make it reasonable . . . to read the statute's language as

---

[1] The decision in Flores-Figueroa did not technically change the law in the Second Circuit, which
had never addressed the issue.  129 S. Ct. at 1889-90 (citing decisions in courts of appeals).

dispensing with the knowledge requirement." Id. It concluded resoundingly that "the practical problems of enforcement [were not] sufficient to overcome the ordinary meaning" of the statute. Id. at 1893-94.

In the wake of Flores-Figueroa, several courts have now addressed this issue, including two courts in this circuit. In Graham v. United States, 2010 U.S. Dist. LEXIS 68273, Judge Cogan denied the petitioner § 2255 relief, finding that she could not establish actual innocence based on the "bare assertion that '[she] never had knowledge of it being an actual person and did not know the individual at all.'" Id. at *11. Dispositively, "[a]t the time of her arrest, petitioner admitted . . . her real name . . . [and] explained that [the passport belonged to] a woman with similar physical characteristics whom she had met while visiting a doctor's office." Id. at *1-2. Similarly, in Dolan v. United States, 09-CV-893, 2009 U.S. Dist. LEXIS 85620 (D. Conn. Sept. 2, 2009), Judge Thompson found that the petitioner could not establish that he did not know that "the means of identification at issue belonged to another person." Id. at *17. There, while under oath before the magistrate judge, the petitioner stated "I and others engaged in a scheme to obtain credit card numbers and other personal financial data of others for our own benefit." Id. at *17-18. He further stated that he sent spam messages to "these people" in order to collect their "name[s], Social Security number[s], bank account number[s] and information. This was done in an effort to obtain their credit card numbers." Id. at *18. Also, when asked whether he had "any permission from any of the people who the credit cards belonged to, to use their credit card?", the petitioner responded "No, Your Honor." Id.

Outside this circuit, other courts have also considered the issue. The cases range from simple to complex. On the one hand, there are cases where the answer was clear—where either

the government conceded that it could not establish the knowledge requirement, see United States v. Berry, 369 F. App'x 500, 502 (4th Cir. 2010) (the government conceded that "the record [was] devoid of evidence establishing that [petitioner] knew the identification he stole belonged to another person"), or where there was clearly sufficient evidence in the record to establish knowledge, see United States v. Mostranzo, No. 2:08-CR-36-DCR, No. 2:10-CV-7117-DCR, 2011 U.S. Dist. LEXIS 16578, at *23 (E.D. Ky. Jan. 31, 2011) (defendant admitted that he "was knowingly transporting illegal aliens, . . . had an ID not his own, . . . and that identification (from Indiana) belonged lawfully to another"). On the other end of the spectrum are cases that are not as clear cut. Considering the circumstantial evidence presented, courts have vacated the conviction where the record lacks sufficient proof to demonstrate knowledge. See, e.g., United States v. Chavez-Quintana, 330 F. App'x 724, 727 (10th Cir. 2009) ("We are aware of no evidence that could demonstrate that [petitioner] knew the Social Security number that he used belonged to another person; for example, the government makes no attempt to demonstrate how [he] obtained the false Social Security number or whether he was acquainted with [] the person whose Social Security number he was using."). And they have affirmed the conviction where there was sufficient circumstantial evidence to establish knowledge—most commonly, the repeated use of the identification by the defendant. See, e.g., United States v. Holmes, 595 F.3d 1255, 1257 (11th Cir. 2010) ("When [petitioner] used the social security card to apply for a driver's license, identification card, and passport, she knew that the social security card belonged to a real person. . . . A reasonable jury [] could have found that [petitioner's] willingness to subject the social security card repeatedly to government scrutiny established that she knew, all along, that the social security card belonged to a real person and was not a forgery."); United

States v. Gomez-Castro, 605 F.3d 1245, 1248 (11th Cir. 2010) ("Before [petitioner] presented

the passport for entry in 2008, [she] had repeatedly and successfully tested the authenticity of the

birth certificate and social security card: she used them to obtain a New York driver's license and

benefits card, two credit cards, a bank card, and the United States passport used in this crime.

This circumstantial evidence supports a finding that [she] knew the [] identity belonged to a real

person when she later presented the passport bearing that identity to the border officer.")

     *c.   Castillo's Claim of Innocence*

There is no easy-fitting pigeonhole for Castillo's case. Of course, the question is, simply

put: can Castillo show that no reasonable juror would have found that he knew that the passport

he used to enter the United States was not only fraudulent but also belonged to an actual person?

As noted earlier, his plea colloquy on its own undoubtedly fails to establish that he knew the

passport he used had been issued to another person:

> QUESTION: When you arrived at JFK Airport on June 23, 2006, you were
> carrying what purported to be a United States passport?
>
> CASTILLO: Yes.
>
> QUESTION: Which bore your photograph?
>
> CASTILLO: Yes.
>
> QUESTION: And instead of your name, had the name Jorge Nieves?
>
> CASTILLO: Yes.

Satisfied with the allocution at the time of plea, the government argues, at least perfunctorily, in

its initial opposition to Castillo's petition, that the quoted colloquy sufficiently established

Castillo's guilt. Concluding most definitively otherwise, the Court ordered an evidentiary

hearing[2] on July 13, 2011, to permit the government to present any additional admissible

evidence of petitioner's guilt. The Court also appointed counsel to represent Castillo.

At the hearing, the government successfully established that the passport Castillo used

belonged to a real person. It submitted a forensic examination of the passport which revealed it

to be "an altered genuine passport and that [Castillo's] photograph on the inside front cover had

been substituted in place of the original issue passport [photograph." (Government's Post

Hearing Memorandum ("Gov't Memo."), Exhibit 5). The government also provided a

certification from the Social Security Administration that the social security number and card in

Castillo's possession upon his entry to the United States belonged to Jorge Luis Nieves. (Gov't

Memo, Exhibit 7). Second, and more importantly, the government elicited testimony from

Castillo himself that it submits establishes circumstantially that he knew that the passport he used

belonged to an actual person.

In overview, the government's general theory from the outset was that

> Castillo could not have hoped to enter the United States on a
> passport unless it belonged to a real person whose identity could
> not be verified at the border. The entire value of the passport to
> Castillo was its ability to allow him to enter the United States
> under another person's identity, since Castillo himself was barred
> from entering the country.

The government's syllogism does not hold without more. It assumes by imputation that every

defendant who purchases a fake passport must know of its original authenticity simply because

the value of such identification is in its authenticity, i.e., if the passport did not belong to a real

_____

[2] Section 2255(b) instructs that when considering a petition for a writ of habeas, "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255.

human being, it would not work at the border. Such circular reasoning, however, essentially

eviscerates Flores-Figueroa, which was ground-shaking because it required *actual knowledge*

that the identification belongs to another person be established beyond a reasonable doubt. And

while proving knowledge in this respect may appear to be a high bar, the Supreme Court was

forceful in its conclusion that, in enacting § 1028A, "Congress [did not] place[] conclusive

weight upon practical enforcement" because if it had, "the statute would likely not read the way

it now reads." Flores-Figueroa, 129 S. Ct. at 1893.

But the bar, as high as it may seem, is obviously not insurmountable. In fact, in the

context of identity theft, guilty knowledge is not impossible to prove. For example, "where a

defendant has used another person's identification information to get access to that person's bank

account, the Government can prove knowledge with little difficulty." Id. Additionally, "when

the defendant has gone through someone else's trash to find discarded credit card and bank

statements, or pretends to be from the victim's bank and requests personal identifying

information," knowledge is easily established. Further, in cases like this one where the stolen

identity is of a person who is not the target for victimization, knowledge can perhaps be

established through evidence of repeated use of the identification by a defendant, since, after the

first time the identification is accepted by, e.g., a government agency, the defendant is on notice

of its authenticity. See, e.g., Holmes, 595 F.3d at 1257 (11th Cir. 2010) (willingness to

repeatedly subject a social security card to government scrutiny established that the petitioner

knows the card belonged to a real person and was not fake).

Here, the evidentiary cupboard is not bare. Castillo submitted an affidavit in which he

swore that he purchased the passport from someone who made no representation about its

13

authenticity, that he has no personal knowledge that the passport belonged to another person, that he had no reason to believe that the passport belonged to a real person, and that he does not know anyone named Jorge Luis Nieves. (Pet. Exhibit C). The government called Castillo to testify at the hearing. On the witness stand, Castillo then testified more fully about how he came to be in possession of the passport and other identity documents in Nieves's name that were in his possession when he was arrested at John F. Kennedy Airport. Castillo testified that in February 2006, he purchased a passport, social security card, and birth certificate in the name Jorge Luis Nieves on a street in Duarte, Santo Domingo. (Tr. 20, 24). He paid approximately $500 (U.S.) for these documents. (Tr. 34). After purchasing the passport, petitioner paid an additional $50 (U.S.) to another individual for an entrance stamp, to make it appear as though the holder of the passport had legally entered the Dominican Republic in May 2006. (Tr. 23-25). He purchased the birth certificate and social security card in addition to the passport to ensure that he "could be able to come through better." (Tr. 35). He testified that "[s]ometimes if you have a passport they [Immigration] ask you for license, they always ask for something else." (Tr. 36).

Two lines of questioning do advance the government's case. First, regarding the birth certificate, the government focused on the presence of a seal and the necessary implication that the seal is proof of the document's authenticity. (Tr. 27-33). Castillo admitted that his own birth certificate has an official government stamp, but stated that he knows that it is an original because he "went to take it" and he knows "where [it] was taken from." (Tr. 30). He also testified that his children, who were born in the United States, all received birth certificates. (Tr. 39). But these acknowledgements do not prove that Castillo knew that the birth certificate he purchased was fraudulent, much less that the passport belonged to the actual person named on

14

the birth certificate. In examining the birth certificate itself, the Court notes that it does have a raised seal and is badly worn. (Gov't Memo, Exhibit 3). The short of all these facts is—so what? Surely when one purchases a fake document for a high price, the hope is that it will appear to be authentic even if it is not—i.e., including seals, stamps, and all the bells and whistles that normally accompany an authentic document. The presence or lack of a seal, or the implication that a seal means that the document is real, is only marginally probative of the requisite knowledge. The government did offer proof that those documents were authenticated. Regardless, and critically, it offered no proof whatsoever that Castillo had knowledge sufficient to evaluate their authenticity.

Another major theory of the government's defense centered on Castillo's familiarity with passport features. The field was far more fertile here. Inquiry was made about the barcode on the back of the passport. It was designed to show that Castillo was aware of the presence of the barcode, of the fact that immigration officials would run the barcode through a computer at the border, and that the search would bring up Nieves's information on the screen because information about a real person was in the system. (Tr. 40-44). In establishing petitioner's knowledge of barcode technology, the government's questioning analogized passport barcodes to barcodes on grocery items at a supermarket. (Tr. 41). Castillo testified, incredibly, that with all his years in America, he never "paid attention to that." (Tr. 41). Moving on to the actual passport, he testified that he "had never traveled with [a United States passport and] didn't know" the process. (Tr. 41). The last time Castillo had entered the United States was in 1992, and he did so with a Dominican Republic passport *and* a United States residency card. (Tr. 37). Damningly, he admitted that officials did swipe his residency card when he entered then. (Tr.

15

57-58). Without doubt, it is reasonable to infer that Castillo knew the card had been swiped to check against computerized information of a real person—himself.

The mere expectation that a document will be verified is, of course, not conclusive evidence in and of itself of *"knowledge"* that the document belongs to an actual person. But directing his attention again to the barcode on his passport, the government asked whether Castillo had any idea whose name would come up in the computer if the barcode was swiped. (Tr. 42). This brought a further damning admission. Castillo acknowledged that if anyone's name came up on the computer it would be Nieves's, given that the documents in Castillo's possession bore Nieves's name. (Tr. 42). From his admitted past experience at the border, he also knew if no name came up, he would be arrested. Critical to his defense is his desperate (and incredible) denial of his knowledge of barcode systems and studied failure to observe a barcode on the passport he would and did present at the border. Given *this* knowledge, coupled with his own experience with barcoded documents at the border, the only reasonable explanation for Castillo's actions is that he also *knew* Nieves was in the system and was in the system because he *knew* Nieves, like himself, was a real person who had submitted that information to border authorities. This *combination* of facts is powerfully probative, at least as much if no more so than proof by repeated successful use of an identification document elsewhere. But see Soto v. United States, 09-CIV-22856, 2010 U.S. Dist. LEXIS 7889, at *6-7 (S.D. Fla. Jan. 12, 2010) (noting that "[t]he fact that a person submits identification that is subject to verification is evidence that a person may have had an incentive to obtain the identification of a real person; it is not evidence that the person knew that the identification he or she obtained was that of a real person").

It is true, surely, that Castillo's admission that when he bought a passport he wanted to procure one that would guarantee his admission to the United States does not alone prove knowledge that the passport he obtained was of a real person. A person necessarily purchases false identification with the hope that it can be passed off as authentic. This hope does not equate to knowledge required for guilt. Yet, there is more here than a mere hopeful purchase. Castillo had crossed the border before and knew of the computer dominated processing. He also lived in the United States for many years and was familiar with barcodes and computerized recordkeeping. (Again, his attempts to minimize such knowledge were incredible.) More than a simple purchase of a fake, Castillo purchased the documents with the expectation that they would work because he knew that, before the passport was altered, it was a genuine passport of a real person.

Castillo tries to tailor his argument to tightly embrace Flores-Figueroa. Castillo claims he "did not care whether the papers (1) were real papers belonging to another person or (2) were simply counterfeit papers." 129 S. Ct. at 1892. What Castillo cared about most, however, was obtaining documents that would permit him to sneak back into the United States. His testimony clearly shows that he was familiar with what those documents needed to be—stolen, borrowed or purchased from a *real* person with a *real* American passport. That Castillo was specifically aware of how authenticating devices at the airport worked is undeniable. His testimony denying knowledge of barcoded computerized information was unmistakably incredible.[3] The

_____

[3] There were also other inconsistencies in Castillo's testimony, namely, about whether or not he opened the passport and noticed the barcode. (Tr. 56-57). During questioning by the Court, Castillo first said that the only thing he looked at when he received the passport was the photograph. (Tr. 56). But he then admitted that he opened the passport and looked at the pages to notice that the entrance stamp was missing. (Tr. 57).

17

circumstantial evidence supports the finding that a reasonable juror could conclude beyond a reasonable doubt that Castillo knew the documents he used were of a real person.

In Flores-Figueroa, the Supreme Court noted that:

> The Government . . . describes the purpose [of the statute] as "provid[ing] enhanced protection for individuals whose identifying information is used to facilitate the commission of crimes." And it points out that without the knowledge requirement, potential offenders will take great care to avoid wrongly using IDs that belong to others, thereby enhancing the protection that the statute offers.
>
> The question, however, is whether Congress intended to achieve this enhanced protection by permitting conviction of those who do not know the ID they unlawfully use refers to a real person, i.e., those who do not intend to cause this further harm.

129 S. Ct. at 1892 (internal citation omitted). This Court is fully in accord. Simple purchase of a false passport on the streets of Duarte, Santo Domingo is insufficient under this standard. In Castillo's case though, the circumstantial evidence is far more compelling. Petitioner had entered the United States legally before. He had been a long-time resident alien. He was familiar with barcodes and instant computerized border checks. He had been the subject of such checks before. Given these additional circumstances, it is more than reasonable to infer that Castillo knew his only chance for re-entry was to use the identity of a real person already in the passport system. That had to be the *kind* of false passport identity he paid handsomely to obtain.

In sum, to establish actual innocence under § 2255, Castillo was required to establish that it is more likely than not that no reasonable juror would have convicted him of aggravated identity theft. He has come up short. As such, his petition for a writ of habeas corpus is denied.

### III.   CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus filed by Kelvin Castillo

18

is dismissed and the writ is denied.  Nevertheless, the Court issues a Certificate of Appealability

since reasonable jurists could disagree on these grounds as to whether Castillo's petition should

have been resolved differently.  See Slack v. McDaniel, 529 U.S. 473, 483-84, 120 S. Ct. 1595,

1603-04 (2000).  The Court further grants in forma pauperis status for the purpose of any appeal.

The Clerk is directed to enter judgment in accordance with this Memorandum and Order

and to close this case.

**SO ORDERED.**

Dated: Brooklyn, New York
September 29, 2011

ERIC N. VITALIANO
United States District Judge

19